1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11    LARRY ROSSER,                    )   Civil No. 10-2203-MMA(WVG)
                                       )
12                    Petitioner,      )   REPORT AND RECOMMENDATION
                                       )   GRANTING PETITION FOR WRIT OF
13    v.                               )   HABEAS CORPUS
                                       )
14    MATTHEW CATE, Secretary,         )
                                       )
15                    Respondent.      )
                                       )
16    _____)

17

18                                    I

19                              INTRODUCTION

20         Larry Rosser (hereinafter "Petitioner"), a state prisoner

21    proceeding *pro se*, has filed a First Amended Petition for Writ of

22    Habeas Corpus (hereinafter "Petition"), pursuant to 28 U.S.C. §

23    2254. Respondent Matthew Cate (hereinafter "Respondent") has filed

24    an Answer to Petition for Writ of Habeas Corpus (hereinafter

25    "Answer"). Petitioner has filed a Traverse to Respondent's Answer

26    (hereinafter "Traverse").

27         Prison officials assessed a forfeiture of 181 days of good

28    time credit from Petitioner after a unit-wide cell search found an

                                      1                          10cv2203

altered razor blade in property purportedly belonging to his cell mate. At a Rules Violation Report hearing (hereinafter "RVR hearing"), Petitioner challenged that finding with evidence from a prison guard and from another inmate. Petitioner's evidence tended to show that property belonging to other inmates had been improperly brought into and left within Petitioner's cell during the cell search process.

Petitioner argues that the RVR hearing violated his right to due process under the Fifth and Fourteenth Amendments of the United States Constitution.

The Court has considered the Petition, Respondent's Answer, and Petitioner's Traverse. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court RECOMMENDS that the Petition be GRANTED.

## II

## FACTUAL BACKGROUND

On March 4, 1996, Petitioner was convicted of one count of second degree murder, with an enhancement for use of a firearm, by the Superior Court of Los Angeles. (Respondent's Lodgment No. 1 at 1.) On September 27, 1996, Petitioner was sentenced to a state prison term of 15 years to life imprisonment, plus four years for the enhancement. Id. At the time of these events, Petitioner was serving this sentence at Calipatria State Prison. (Petition at 13.)

### A. CELL 151

On June 24, 2008, prison authorities conducted cell searches within Administrative Segregation Unit One (hereinafter "ASU"). (Petition at 13.) Among the cells searched was ASU cell 151, which was assigned to Petitioner and his cell mate, identified as inmate

10cv2203

Odell Muhammed. (Plaintiff's Exhibit B at 33.) Petitioner was assigned to the upper bunk (ASU-151U) and inmate Muhammad was assigned to the lower bunk (ASU-151L). During the search, Petitioner and inmate Muhammad were placed in the exercise yard. (Petition at 13.)

According to a sworn declaration by Anthony Throop, another inmate, he saw three guards in cell 151 when he was removed from his own cell and taken to the exercise yard. (Respondent's Lodgment No. 3, Exhibit C). When inmate Throop returned to his cell, he saw two different guards in cell 151. Id. The two officers who signed the cell search receipt for cell 151 were Officers M. Givens and P. Castro. (Respondent's Lodgment No. 3, Exhibit G.) There appear to be two names crossed out on the receipt before the names "M. Givens" and "P. Castro". Id. Petitioner alleges that the presence of the three unknown guards in the cell before Officers Givens and Castro was a violation of search protocol. (Petition at 14.)

   B. <u>PROPERTY FROM CELL 151</u>

Officer Castro's report indicates that he or she removed inmate Muhammad's property from the lower bunk and placed it in a crate. (Respondent's Lodgment No. 3, Exhibit B at 28.) Officer Castro's report does not list or itemize the property removed. <u>See id.</u> Officer Castro's report states that the contents of the crate were then X-rayed by CRT Officer A. Adams and CRT Sergeant B. Smith at the Rapiscan scanning station. <u>Id.</u> There is no report or testimony from Officers Adams or Smith as to this search. Officer Castro's report states that, upon a positive scan, Sergeant Smith removed a black colored book from the crate, labeled it, and gave it

1  to Squad Officer L. Hernandez to search. Id. On June 24, 2008,

2  Officer Castro's report was reviewed by Lieutenant R.G. Hopper. Id.

3  　　　According to an Incident Report by Officer Hernandez, when he

4  received the book, it was labeled as originating from ASU-151L

5  (assigned to Petitioner's cell mate, inmate Muhammad). (Respondent's

6  Lodgment No. 3, Exhibit B at 33.) Officer Hernandez searched the

7  book, titled "The Plain Language Law Dictionary," and discovered an

8  altered razor blade hidden within it. Id. Petitioner claims that

9  neither the book nor the weapon was in the cell before he and his

10  cell mate were removed for the cell search. (Petition at 14.) The

11  Incident Report is dated June 20, 2008. (Respondent's Lodgment No.

12  3, Exhibit B at 33.) The Incident Report was reviewed by Officer M.

13  Morales who dated his review as June 20, 2008. Id. The date of the

14  Incident Report is inconsistent with the fact that the cell searches

15  took place on June 24, 2008.

16  　　　There is therefore a dispute as to the origin of the book

17  containing the altered razor blade.

18  　　　C. CRATE FOUND IN CELL 151

19  　　　Upon Petitioner and inmate Muhammad's return to cell 151,

20  they discovered in their cell a crate of unknown origin. (Petition

21  at 13.) Petitioner further claims that he and his cell mate

22  discovered that "personal property items belonging to other inmates

23  had been placed in their cell." Id. According to Petitioner, he

24  placed the personal property into the crate and discarded "all the

25  non-valuable items." Id. Inmate Throop's sworn declaration lends

26  credence to Petitioner's version of events: "[a]t that time, they

27  [Petitioner and inmate Muhammad] told me... there was a plastic

28  crate with someone else's books, papers, and other materials left

10cv2203

behind in their cell." (Respondent's Lodgment No. 3, Exhibit C at
2.) Throop further attests that he "observed as dozens of guards...
milled about" and that "staff appeared to be lost and unsure of what
to do or where to go..." Id. Throop notes that "[t]he entire hallway
was in disarry [sic] with trash, discarded clothing, linen, and
stacks of magazines, *books, newspapers and other paperwork every-*
*where (in, _and_ out of plastic crates*.")[1]/ Id.

Petitioner subsequently informed Officer Rucker of the crate
that had been left in cell 151. (Petition at 13.) Officer Rucker
informed Officer Woodward who then removed the crate from cell 151.
Id. Officer Woodward alleges that the crate "contained misselaneous
(sic) trash, and discarded paper from cell searches." (Respondent's
Lodgment No. 3, at Exhibit G.) On September 25, 2008 Officer L.
Romero questioned Officer Woodward and inmate Muhammad. Officer
Woodward recalled retrieving the crate from cell 151. (Respondent's
Lodgment No. 3, Exhibit F.) Officer Woodward refused to answer
questions about what the hallways looked like during the searches,
responding that the question was "not relevant." Id.

In contrast, Officer Rucker "clearly" remembered that the
crate contained legal briefs and miscellaneous paperwork. (Respon-
dent's Lodgment No. 3, Exhibit D.) Rucker also reported that he
"seemed to recall 1 or 2 books, and 1 or 2 magazines. Some items
appeared to be legal briefs." Id. He remembered that most of the
property was labeled with Hispanic names and that he thought the
items should still be with those inmates. Id. Officer Rucker further
recalled that some of the items were post-marked or dated in May

---

[1]/Italic emphasis added, underline emphasis original.

10cv2203

1   2008. Id. Officer Rucker's recollection was dated October 9, 2008.

2   Id. However, this account is at odds with Officer Rucker's state-

3   ments when he was interviewed by Officer Romero on September 15,

4   2008. (Respondent's Lodgment No. 3, Exhibit F.) In that interview,

5   Officer Rucker was asked, "Do you recall whether said milk crate

6   contained personal property belonging to other inmates?" and he

7   replied "Trash." Id. At the RVR hearing on August 5, 2008, the

8   presiding Senior Hearing Officer (SHO), Lieutenant Prado, asked

9   Officer Rucker similar questions:

10          Q3.) Do you recall whether said milk crate contained personal

11          property belonging to other inmates?

12          A3.) I think so.

13          Q4.) Despite the lapse of time, is it possible that you might

14          be able to identify what some of those property items were?

15          A4.) Not really.

16   (Respondent's Lodgment 3, Exhibit I.) Petitioner alleges that the

17   SHO omitted or changed parts of Officer Rucker's testimony when

18   documenting the record of the RVR hearing. (Petition at 16.) How

19   Officer Rucker could have remembered the details of items within the

20   crate in October 2008 but not in August 2008 is unexplained.

21          Therefore, while there is a dispute as to the nature of items

22   left within Petitioner's cell by prison officials, there is no

23   dispute that items were in fact left in Petitioner's cell.

24          On June 27, 2008, an RVR was then issued to Petitioner and

25   his cell mate. (Petition at 14; see also Respondent's Lodgment No.

26   2, Exhibit H.) The RVR charged Petitioner and his cell mate with a

27   violation of California Code of Regulations § 3006(a); specifically,

28

10cv2203

possession of a deadly weapon.[2] (Petition at 14.) The weapon in question was the altered razor blade found within "The Plain Language Law Dictionary". (Respondent's Lodgment No. 3, Exhibit B at 33.)

III

PROCEDURAL BACKGROUND

A. FIRST LEVEL REVIEW

On August 5, 2008, Petitioner appeared before the Senior Hearing Officer (hereinafter "SHO") to challenge the RVR. (Petition at 15.) The SHO was Lieutenant Prado; Petitioner states that he filed a staff complaint against this officer "[a]bout a month prior to the hearing".[3] Id. Petitioner alleges that, during the hearing, Lieutenant Prado mentioned "that one of his partners had been sliced on the arm with a razor by a prisoner during Prado's rookie year... [and] that he suffers flashbacks, relives the horrifying event, and experience [sic] withdrawals whenever looking at a razor." Id.

Petitioner further alleges that Lieutenant Prado's written report of the hearing shortened and altered inmate Throop's

---

[2]     The RVR contains unexplained discrepancies as to the cell numbers. Specifically, the RVR reports that Officer Hernandez was alerted to "the possibility of contraband inside a book from cell 154 assigned to Inmates ROSSER (K26537, ASU-151U) and MUHAMMAD (T98221, ASU-154L)." The RVR also states that the book was "labeled as coming from cell ASU-151L" and contained the razor blade. The RVR was signed by Officer Hernandez on June 24, 2008 and reviewed by Lt. Hopper on July 8, 2008.

[3]     Petitioner names the reviewing officer as Lieutenant Hopper. (See, e.g. Petition at 24.) The SHO appears to have been Lieutenant Prado and not Lieutenant Hopper. See Petition at 15; (see also Respondent's Lodgment No. 3, Exhibit I.) Decisions by the administrative appeals bodies and state courts appear to confuse this issue. Petitioner states that Lt. Hopper reviewed the documentation before the hearing and claims that Lt. Hopper *believed* he would be the hearing officer. Petitioner does not claim that Lt. Hopper *actually* served as the hearing officer.

10cv2203

statements. Id. at 16. Specifically, Petitioner claims that Throop's statements were reduced to two sentences. Id. Next, Petitioner claims that Officer Rucker's recollection that the crate left in cell 151 contained legal paperwork belonging to other prisoners was changed so that the record only reflected his recollection of the presence of the crate and not the contents. Id.

Petitioner challenged the RVR, asserting that the book in which the razor was concealed had not been in the cell prior to the searches. Id. at 17. He argues that the three unidentified guards were responsible for placing the book in cell 151. Id. Petitioner believes that the book was placed there either by mistake or deliberately. Id. Petitioner believes that prison officials may have planted the book and razor in cell 151 in retaliation for Peti-tioner's June 4, 2008 notice to them that he was planning a civil action against them. Id.

The written report of the RVR hearing states that the SHO found Petitioner guilty of the violation. Furthermore, the report indicates that three pieces of evidence were relied upon: 1) Hernandez's written report, 2) testimony by witnesses at the hearing, and 3) information from the incident package.

B. SECOND LEVEL APPEAL

On October 7, 2008, Petitioner appealed the SHO's findings. (Respondent's Lodgment No. 3, Exhibit A at 1.) Petitioner claimed that his investigative process was improperly interfered with by the SHO. Id. He alleged that the SHO mischaracterized reports, was biased, and improperly abridged testimony. Id. First, Petitioner claimed that the SHO stated that a weapon was found in Petitioner's property despite no testimony or documentation referring to his

1    property. Id. Second, he claimed that the SHO was biased because the

2    SHO suffered from post traumatic stress disorder (hereinafter

3    "PTSD") stemming from a past razor attack on his partner.[4/] Id. at

4    3.

5          Third, Petitioner alleged that the summary of the hearing

6    prepared by the SHO was improperly shortened and did not reflect the

7    extent of testimony given by inmate Throop and Officer Rucker. Id.

8    Petitioner noted that Throop testified that the ASU was crowded,

9    that the guards appeared disorganized, and that unidentified guards

10   were seen in cell 151 after Petitioner and inmate Muhammad had left

11   the cell and before the cell search. Id.; (see also Respondent's

12   Lodgment No. 3, Exhibit C.) However, the SHO's hearing report states

13   only that Throop testified that guards were confused and that Throop

14   believed the staff were liable to make mistakes. (Respondent's

15   Lodgment No. 3, Exhibit I.) As to Officer Rucker, Petitioner noted

16   that Officer Rucker clearly recalled the contents of the crate as

17   personal property of other inmates and even remembered the postmark

18   dates on some of the documents. (Respondent's Lodgment No. 3,

19   Exhibit A at 3.) In contrast, the SHO's hearing report indicates

20   that Officer Rucker only thought he could remember the presence of

21   other inmates' property and that he could not identify what property

22   was in the crate. (Respondent's Lodgment No. 3, Exhibit I.)

23          As a part of this claim, Petitioner further alleged that

24   testimony given by Officer Woodward at the hearing was coached by

25

26   _____

27   [4/]      It is unclear if Petitioner made this claim against Lt. Hopper or
         Lt. Prado at this level. In his appeal, Petitioner appears to
         believe the SHO was Lt. Hopper; however, the hearing record
28       indicates that Lt. Prado was the SHO. In his subsequent request for
         review, Petitioner states that this claim was in fact against Lt.
         Prado.

10cv2203

the SHO. (Respondent's Lodgment No. 3, Exhibit A at 3-4.) Specifi-
cally, Petitioner states that Officer Woodward could not recall what
items were in the crate until the SHO asked him if the crate
contained trash collected from cell to cell. Id. At that point,
Officer Woodward agreed with the SHO. Id.; (see also Respondent's
Lodgment No. 3, Exhibit I.)

Therefore, there were serious discrepancies between the SHO's
hearing report and the testimony alleged by Petitioner to have been
given at the hearing.

Petitioner's Second Level Appeal was addressed by a written
memorandum on April 8, 2009. [Petition, Exhibit 1(a)(1) at 5-6.] The
memorandum notes that the SHO was Lt. Prado and not Lt. Hopper, thus
apparently disposing of Petitioner's claims of bias. See id. As
previously noted, Petitioner claimed only that Lt. Hopper *believed*
that he would be the hearing officer and did not claim that Lt.
Hopper *actually* served as such. The memorandum does not appear to
directly address the other issues alleged by Petitioner; specifi-
cally, mischaracterization of reports and the discrepancies between
the hearing record and the testimony. See id. Notably, the memoran-
dum states that the "weapon was secreted inside of a book, which was
labeled as coming from cell 151U." Id. This is factually incorrect;
Hernandez's report clearly states that the book was labeled "ASU-
151L". (Respondent's Lodgment No. 3, Exhibit B at 33.)

The memorandum concludes with a denial of the appeal on the
bases of the three pieces of evidence cited by the SHO. Id.


C. DIRECTOR'S LEVEL DECISION

10cv2203

On April 20, 2009, Petitioner requested a Director's Level Review, arguing that the Second Level Review was partisan or arbitrary and repeating his earlier claims. (Petition, Exhibit 1(a)(2).) Petitioner stated that the Second Level Review had misunderstood his claims regarding Lt. Hopper and that Lt. Prado was in fact the officer suffering from PTSD (and therefore, was allegedly biased). Id. Petitioner also noted that the Second Level Review had addressed only one of his several grounds for appeal. Id. Finally, Petitioner alleged that the Second Level Review was tardy and that "[t]hey sat on it all this time."[5/] Id.

The Director's Level Appeal decision, dated July 27, 2009, found that Petitioner did not present sufficient evidence or facts. [Petition, Exhibit 1(a)(3).] The decision states that there was no support for a claim of falsified documents. Id. The decision also notes that a Second Level Review occurred but it does not indicate what deference, if any, was given to the Second Level Review memorandum. Id.

D. SUPERIOR COURT

On September 22, 2009, Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of the State of California. (Respondent's Lodgment No. 2.) Many of Petitioner's arguments were substantially similar to those raised in the Second Level Review. [See id.; see also Petition, Exhibit 1(a).] Among other things, Petitioner alleged that the "SHO strategically left out [parts of inmate] Throop's declaration. (Respondent's Lodgment No. 2, at 10.)

---

[5/]    The Second Level Review response memorandum is dated six months after the appeal was filed. It is unclear if such appeal responses typically take this length of time, if there were other procedural delays, or if the delay reflects deliberate tardiness.

10cv2203

1       The state court stated that the First Level Review "hearing

2   officer had evidence that during a cell search, a book was located

3   in petitioner [sic] cell. When x-rayed, it was revealed that a razor

4   blade was concealed in the book." In re Larry Rosser, No. EHC 01253

5   at 1 (Cal. Sup. Ct. of Imperial County, 2009). That court acknowl-

6   edged that the "court's review of the sufficiency of the evidence

7   offered at an administrative hearing is limited to the question of

8   whether the decision of the hearing officer is supported by 'some'

9   evidence." Id., citing In re Zepeda 141 Cal. App. 4th 1493 (2006).

10  The state court found that the SHO's decision "was supported by

11  ponderable evidence" and consequently, on December 7, 2009, denied

12  the Petition. In re Larry Rosser, No. EHC 01253 at 2.

13      E. CALIFORNIA COURT OF APPEAL

14      On February 15, 2010, Petitioner appealed the state court

15  decision. (Respondent's Lodgment No. 3.) He raised many of the same

16  issues previously presented to the Superior Court (but not addressed

17  in that court's decision). Id. Notably, he again claimed that the

18  SHO had not "properly prepared and preserved" the record of the

19  hearing, apparently referring to his allegation that the SHO had

20  omitted certain testimony from the record. Id.

21      The appellate court stated as fact that the weapon was found

22  within cell 151, apparently relying upon the SHO's hearing report.

23  See In re Larry Rosser, D056785 at 1 (Cal. Ct. of Appeal, 4th Dist.,

24  Div. 1, 2010). The Court of Appeal looked to the five procedural due

25  process requirements set forth by the Supreme Court for claims

26  arising from prison disciplinary hearings: written notice of the

27  charges, at least 24 hours between notice and the hearing to prepare

28  a defense, a written statement by the fact finders of the evidence

10cv2203

1    they rely on, the right of the prisoner to call witnesses when doing

2    so is not unduly hazardous to safety, and, if the prisoner is

3    illiterate or the issues are legally complex, legal assistance. See

4    id at 2; see also Wolff v. McDonnell, 418 U.S. 539, 556 (1974). The

5    Court of Appeal found that Petitioner's due process rights were not

6    violated. In re Larry Rosser, D056785 at 2; (Respondent's Lodgment

7    No. 4.)

8         The Court of Appeal also partially addressed Petitioner's

9    contention of insufficient evidence to support a guilty finding. Id.

10   It held that constructive possession existed because Petitioner had

11   "access to and joint control over the bunk where the weapon was

12   secreted" and that constructive possession was sufficient to find

13   Petitioner guilty. Id. It applied the standard cited in Zepeda,

14   noting that a reviewing court is limited to considering whether any

15   evidence in the record could support the conclusions reached by the

16   disciplinary hearing. Id. In this case, the Court of Appeal

17   determined the standard had been met and consequently denied

18   Petitioner's appeal.

19        F. EXHAUSTION OF STATE REMEDIES

20        On June 30, 2010, Petitioner filed an appeal to the Califor-

21   nia Supreme Court. The California Supreme Court denied the appeal

22   without comment. (Respondent's Lodgment No. 5.) Therefore, its

23   denial of his appeal exhausted Petitioner's state remedies. See id.

24        On December 3, 2010, Petitioner filed the First Amended

25   Petition for Writ of Habeas Corpus now pending before this Court.

26

27                                    IV

28              PETITIONER'S CLAIMS FOR RELIEF

1    Petitioner raises four claims for relief. First, he argues
2    that his due process right to an impartial hearing was violated
3    because the SHO was biased. Second, he claims that his due process
4    rights were violated when he was denied a written statement of the
5    facts relied on by the SHO to find Petitioner guilty. Third, he
6    contends that his due process rights to have documentary evidence
7    prepared and presented in defense of the charge and to review
8    witness statements at least 24 hours in advance were violated.
9    Fourth, Petitioner argues that he was denied adequate corrective
10   process by the state appellate court after the state court applied
11   the Zepeda standard. The Petitioner further argues that even if that
12   standard applied, the record does not support the guilty finding.

13       A. THE SHO WAS NOT IMPARTIAL

14       Petitioner's first ground for relief is that Lt. Prado, the
15   hearing officer at the First Level Review, was biased and that his
16   participation therefore denied Petitioner an impartial hearing.
17   (Petition at 15.) Specifically, Petitioner states that he had filed
18   a complaint against Lt. Prado a month before the hearing. Id.
19   Petitioner also recounts that Lt. Prado explained during the hearing
20   that one of the officer's partners "had been sliced on the arm with
21   a razor by a prisoner" and that Lt. Prado suffers flashbacks. Id.

22       On this basis, Petitioner argues that Lt. Prado was biased
23   and therefore should not have served as the SHO. Id. Petitioner
24   concludes that this violated his constitutional right to be heard by
25   an impartial disciplinary authority. Id. at 18; see also, Clutchette
26   v. Procunier, 497 F.2d 809, 820 (9th Cir. 1978) (overturned on other
27   grounds).

28       B. PETITIONER WAS NOT PRESENTED WITH A STATEMENT OF THE FACTS
         USED BY THE SHO TO FIND HIM GUILTY

10cv2203

1    Petitioner's second ground for relief is that he was not

2  presented with a statement of the facts used by the SHO in determin-

3  ing his guilt. (Petition at 19.) He argues that the written report

4  provided to him does not comport to the actual testimony and

5  documentary evidence presented at the hearing. Id. at 20. Specifi-

6  cally, Petitioner alleges that his conviction was not supported by

7  the findings and that the findings were not supported by the

8  evidence. Id. at 23. He further argues that some of the evidence

9  used at the hearing was facially incorrect and that he was conse-

10  quently hampered in his administrative and state court appeals

11  processes. Id. at 21-23. Petitioner also contends that he did not

12  have constructive possession of the weapon because he did not have

13  knowledge, dominion, or control of the weapon. Id. at 23.

14    Petitioner concludes that this violated his due process right

15  to a written statement of the evidence relied upon to find him

16  guilty, as enunciated in Wolff. Id. at 20-21.

17        C. PETITIONER WAS NOT GIVEN 24 HOURS BEFORE THE HEARING TO
           REVIEW DOCUMENTARY EVIDENCE AND WITNESS STATEMENTS
18    Petitioner's third ground for relief is that the investigat-

19  ing employee failed to correctly prepare a record of witness

20  statements and evidence at least 24 hours in advance of the hearing.

21  Id. at 24. As a result, Petitioner argues that the SHO

22  mischaracterized the testimony of inmate Throop and Officer Rucker

23  at the hearing. Id. at 25.

24    Petitioner concludes that this violated his due process right

25  to advance written notice of the claimed violation and evidence

26  against him, as set forth in Wolff. Id.

27        D. STATE COURTS APPLIED THE INCORRECT EVIDENTIARY STANDARD;
           EVEN IF THAT STANDARD WAS CORRECT, IT WAS NOT MET
28

10cv2203

1    Petitioner's fourth ground for relief is that the state and

2  state appellate courts should not have applied <u>Zepeda</u>'s "any

3  evidence supports the finding" standard. <u>Id.</u> at 26. He argues that

4  the correct standard should have been "preponderance of the evidence

5  supports the finding." <u>Id.</u> Petitioner further contends that even the

6  <u>Zepeda</u> standard was not met in his case. <u>Id.</u> at 27-28.

7    Petitioner concludes that the application of this standard

8  and the subsequent failure of the state appellate court to order

9  corrective action violated his due process rights. <u>Id.</u> at 26.

10    V

11    <u>STANDARD OF REVIEW</u>

12    In order for federal subject matter jurisdiction over a

13  petition for writ of habeas corpus to lie, the petition must allege

14  that the petitioner is in custody in violation of the Constitution

15  or laws or treaties of the United States. <u>See</u> 28 U.S.C.A. § 2254(a).

16    In habeas corpus cases, federal courts are bound by the

17  state's interpretation of its own law. <u>Estelle v. McGuire</u>, 502 U.S.

18  62, 68 (1991) (federal courts may not reexamine state court

19  determinations on questions of state law); <u>Jackson v. Ylst</u>, 921 F.2d

20  882, 885 (9th Cir. 1990) (federal courts "have no authority to

21  review a state's application of its own laws.") However, "errors of

22  state law do not concern [a federal court] *unless* they rise to the

23  level of a constitutional violation"). <u>Oxborrow v. Eikenberry</u>, 877

24  F.2d 1395, 1400 (9th Cir. 1989), (emphasis added.)

25    The Antiterrorism and Effective Death Penalty Act of 1996

26  (hereinafter "AEDPA") applies to habeas corpus petitions filed after

27  April 24, 1996. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 322-23 (1997).

28  The Petition in this case was filed on December 3, 2010 and is

10cv2203

therefore governed by AEDPA. To obtain federal habeas relief, Petitioner must satisfy either U.S.C.A. § 2254(d)(1) or (2). See Williams v. Taylor, 529 U.S. 362, 403 (2000).

The Supreme Court interprets § 2254(d)(1)and (2) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.

A state court's decision may be found to be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from the [the court's] precedent." Id. at 405-406; Lockyer v. Andrade, 538 U.S. 63, 72-75 (2003). A state court decision involves an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or, "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 539 U.S. at 407; Andrade, 538 U.S. at 76.

10cv2203

1    Under § 2254(d)(2), a petitioner may obtain relief by showing
2    that the conclusion of the state court was "an unreasonable
3    determination of the facts in light of the evidence presented in the
4    State court proceeding." Therefore, the court must presume that the
5    state court's factual findings are accurate unless a petitioner
6    rebuts the "presumption of correctness by clear and convincing
7    evidence." U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231,
8    240 (2005).

9    "Even in the context of federal habeas, deference does not
10   imply abandonment or abdication of judicial review. Deference does
11   not by definition preclude relief." Miller-El v. Cockrell, 537 U.S.
12   322, 340 (2003). Factual findings may be infected with substantive
13   legal error where the fact-finding process itself is defective. The
14   state court fact-finding process is undermined where the state court
15   has before it, yet apparently ignores, evidence that supports a
16   petitioner's claim. Id. at 346, Taylor v. Maddox, 366 F.3d 992, 1001
17   (9th Cir. 2004).

18   When there is no reasoned decision from the state's highest
19   court, the Court "looks through" to the underlying appellate court
20   decision. Ylst v. Nunnmeaker, 501 U.S. 797, 801-06 (1991). If the
21   dispositive state court order does not "furnish a basis for its
22   reasoning," federal habeas courts must conduct an independent review
23   of the record to determine whether the state court's decision is
24   contrary to, or an unreasonable application of, clearly established
25   Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.
26   2000) (overruled in part by Andrade, 538 U.S. at 74-77).

27                                   VI

28                   PETITIONER IS ENTITLED TO RELIEF

10cv2203

1    In this case, the California Supreme Court denied Peti-
2  tioner's Appeal without comment. (Respondent's Lodgment No. 5.)
3  Therefore, this Court "looks through" to the decision of the
4  California Court of Appeal, contained in Respondent's Lodgment No.
5  4. See Ylst v. Nunnmeaker, 501 U.S. at 801-06.

6         A. NO EVIDENCE OF BIAS ON THE PART OF THE HEARING OFFICER

7    Petitioner's first claim for relief is based on alleged bias
8  of Lt. Prado, the SHO at the RVR hearing. Rule 2 of the Rules
9  Governing Habeas Corpus Cases requires that a petitioner "state the
10 facts supporting each ground" for relief. Rule 2(c)(2), foll. 28
11 U.S.C. § 2254 (hereinafter "Rule 2".) Under Rule 2, "mere conclusory
12 allegations without the support of facts" are insufficient. Farrow
13 v. U.S., 580 F.2d 1339, 1361-1362 (9th Cir. 1972); Schlette v.
14 Allen, 284 F.2d 827, 834 (9th Cir. 1960); Henderson v. Cate, 2009 WL
15 3126858 at *7 (S.D. Cal. 2009).

16   Petitioner alleges that Lt. Prado was biased because he had
17 witnessed a razor blade attack upon his partner and suffered from
18 PTSD as a result. The California Court of Appeal did not address
19 this claim; therefore, this Court "looks through" to the decision of
20 the decision of the Superior Court of California. That court
21 determined that "[a]s to the [PTSD bias] claim ... nothing in the
22 record indicates that petitioner was not given a fair hearing, and
23 no due process violation is shown." In re Larry Rosser, D056785 at
24 2 (Cal. Ct. of Appeal, 4th Dist., Div. 1, 2010).

25   Upon a careful and thorough review of the various petitions
26 and appeals filed by Petitioner, this Court found only one support-
27 ing statement for the PTSD bias claim: Petitioner's own allegation
28 that Lt. Prado stated that he had witnessed a razor attack by an

10cv2203

1   inmate upon his partner and suffered flashbacks as a result. The

2   record presented to this Court does not contain any corroborative

3   evidence of this statement.

4        Petitioner's contention that Lt. Prado was biased is an

5   unsupported conclusory allegation. Petitioner fails to state a *prima*

6   *facie* case for relief that "overcome[s] a presumption of honesty and

7   integrity" on the part of Lt. Prado. Withrow, 421 U.S. at 46-47; see

8   also Stivers, 71 F.3d at 741.

9        Therefore, the Court RECOMMENDS that Petitioner's first

10  ground for relief be DENIED.

11       B.  PETITIONER RECEIVED A WRITTEN STATEMENT OF THE FACTS
             USED BY THE HEARING OFFICER TO FIND PETITIONER GUILTY

12       Petitioner's second claim for relief is that no written

13  statement of the facts used by the SHO to find Petitioner guilty was

14  provided to him. His argument involves the alleged misapplication of

15  California law. Specifically, Petitioner notes that, under Califor-

16  nia law, "prisoners are expected to be found not guilty of disci-

17  plinary charges unless such is substantiated by the preponderance of

18  the evidence submitted at the hearing". [Petition at 19, citing Cal.

19  Pen. Code § 2932(c)(3) and 15 Cal. Code of Reg. § 3320(1).] He

20  further notes the California Department of Corrections and Rehabili-

21  tation definitions of constructive and actual possession and argues

22  that the preponderance of the evidence did not point to a finding of

23  constructive possession because "the record is devoid of evidence

24  that [he] had knowledge, dominion, or control over the razor."

25       The Court will not comment on the materiality of the

26  purported misapplication of state law. The Court notes that

27  Petitioner's claim in this regard appears to rest solely on the

28  allegedly improper application of state law by state authorities.

10cv2203

1   Federal courts "have no authority to review a state's application of
2   its own laws." <u>Jackson</u>, 921 F.2d at 885. The sole exception to this
3   limitation exists when errors of state law "rise to the level of a
4   constitutional violation." <u>See</u> <u>Oxborrow</u>, 877 F.2d at 1400. Here,
5   Petitioner argues that he suffered a constitutional violation of his
6   due process right to receive a written statement of the evidence
7   relied upon by the factfinder. <u>See</u> <u>Wolff</u>, 418 U.S. at 564.

8       The Court of Appeal appears have relied on a close textual
9   reading of <u>Wolff</u>, which requires that "there must be a 'written
10  statement by the factfinders as to the evidence relied on ... '" <u>See</u>
11  <u>Wolff</u>, 418 U.S. at 564, quoting <u>Morissey v. Brewer</u>, 92 U.S. 471, 489
12  (1972). Since the hearing officer summarized the evidentiary record
13  in his findings and decision, the Court of Appeal accepted that the
14  decision constituted a statement of the evidence relied upon.  If
15  this is true, it is elementary that providing Petitioner with a
16  written copy of that decision meets the letter the dictates of
17  <u>Wolff</u>.

18      Petitioner contends that, if there is no such evidence in the
19  record in support of the SHO's decision, the findings could not have
20  been based on the evidence. Therefore, the decision of the SHO was
21  based on findings which did not reflect the facts and evidence
22  presented at the hearing. This argument is complicated by the
23  disputed aspects of the evidence.

24      The Court finds that Petitioner was provided with a written
25  copy of the SHO's decision which included a summary of the evidence
26  relied upon. Therefore, the relevant requirement set forth in <u>Wolff</u>
27  was satisfied.

28

10cv2203

1    Therefore, the Court RECOMMENDS that Petitioner's second

2    ground for relief be DENIED.

3        C. __PETITIONER WAS GIVEN 24 HOURS TO REVIEW CHARGES AND AN
            OPPORTUNITY TO PRESENT EVIDENCE__

4    Petitioner's third ground for relief is that he was denied

5    the right "to have documentary evidence prepared and presented, in

6    defense of the charge" and the "right to review witnesses statements

7    at least 24 hours in advance of the hearing." (Petition at 24.) He

8    alleges that these rights stem from the Fourteenth Amendment, as

9    stated in _Wolff_. _Id._

10   Petitioner appears to conflate two of the due process

11   protections set forth in _Wolff_: the 24 hour notice requirement and

12   the right to present evidence. He combines elements from these two

13   distinct rules to claim that _Wolff_ requires giving inmates 24 hours

14   in which to review witness statements and evidence.

15   First, _Wolff_ requires that prisoners facing revocation of

16   good time credits be given "... advance notice of the claimed

17   violation ..." _Wolff_, 418 U.S. at 563. The Supreme Court noted that

18   "[p]art of the function of notice is to give the charged party a

19   chance to marshal the facts in his defense and to clarify what the

20   charges are ..." _Id._ at 564. To ensure that the advance notice gives

21   the prisoner that chance, the Supreme Court noted that "[a]t least

22   a period of time after the notice, no less than 24 hours, should be

23   allowed to the inmate to prepare ..." _Id._

24   Second, _Wolff_ requires that the "inmate facing disciplinary

25   proceedings ... be allowed to call witnesses and present documentary

26   evidence in his defense ..." subject to institutional safety and

27   correctional goal concerns. _Id._ at 566.

28

10cv2203

1    In this case, Petitioner was afforded both of these rights.

2    On July 8, 2008, he was informed of the charges and, on July 22,

3    2008, he received a copy of the Incident Report. (Respondent's

4    Lodgment No. 3, Exhibit A.) Both of these events occurred more than

5    24 hours before the August 5, 2008 hearing, thus satisfying the

6    notice requirement. Therefore, Petitioner had notice of the charges

7    against him more than 24 hours before the hearing.

8    Petitioner's "... right to have documentary evidence prepared

9    and presented ..." was not violated since he had the opportunity to

10   prepare and present evidence and witness statements at the hearing

11   and in fact did so. By exercising his right to call witnesses and

12   present evidence, Petitioner clearly demonstrated that he was not

13   denied that right.

14   The Court finds that since the Petitioner was provided with

15   notice of the charges against him more than 24 hours before the

16   hearing and because the Petitioner in fact presented evidence and

17   witnesses at the hearing, the relevant requirements set forth in

18   <u>Wolff</u> were satisfied.

19   Therefore, the Court RECOMMENDS that Petitioner's third

20   ground for relief be DENIED.

21        D. <u>THE STATE COURTS APPLIED THE CORRECT EVIDENTIARY
            STANDARD; HOWEVER, THE STANDARD WAS NOT MET</u>

22   Petitioner's fourth ground for relief is that the state court

23   erred in applying the <u>Zepeda</u> standard and that even if the standard

24   were correct, the evidence presented to the court did not meet that

25   standard. (Petition at 9, 26-28.)

26   Petitioner's first contention, that the <u>Zepeda</u> standard was

27   inappropriate for his case, rests on two arguments. First, he argues

28   that he did not invoke this standard. <u>Id.</u> at 27. He appears to be

10cv2203

1  under the misapprehension that he has control over which standards
2  are to be applied to his case. Standards are used to engender
3  uniformity in the outcomes of cases that are factually and legally
4  similar. Petitioners are not free to pick and choose which standards
5  are applied to their case. Instead, it is the role of a court to
6  determine what standards were previously established in similar
7  cases and to apply them to the case before it. Therefore, Peti-
8  tioner's argument in this regard lacks merit.

9      Second, Petitioner argues that the standard is limited to
10  cases testing the sufficiency of the evidence. Id. 26. In Zepeda,
11  the California Court of Appeal reiterated the standard set forth by
12  the Supreme Court in Superintendent v. Hill. See Zepeda at 1498;
13  Superintendent v. Hill, 472 U.S. 445, 455, 456-457 (1985). Under
14  Hill, a prison disciplinary action will not be disturbed by a
15  reviewing court as long as "some evidence" supports the original
16  finding. Hill, 472 U.S. at 455. The Ninth Circuit has held that
17  Hill's "some evidence" standard is clearly established federal law
18  for AEDPA purposes and applicable to prison disciplinary hearings.
19  Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127-28
20  (9th Cir. 2006). It is apparent that the standard used in Zepeda,
21  which mirrors that in Hill, is applicable as to the sufficiency of
22  the evidence claim raised by Petitioner.

23      Therefore, the Court finds that the state courts did not err
24  in determining that the Zepeda standard was most applicable since it
25  comports with the controlling federal standard.

26      Petitioner's next contention is that the state courts did not
27  fully address his claims as to the veracity of the evidence.
28  Specifically, he alleges that both the administrative and state

10cv2203

1    court appeal decisions relied upon the SHO's account of the

2    evidence. This account was provided to the Petitioner in accordance

3    with Wolff's requirement that inmates against whom disciplinary

4    action has been taken receive a written statement of the evidence

5    relied upon by the factfinder to find them guilty. See Wolff, 418

6    U.S. at 564. To comply with the spirit of the rule in Wolff, the

7    assumption is implicit that the evidence relied upon is truthful,

8    accurate, and reliable. The Court also notes that, under Hill, there

9    "must be some indicia of reliability of the information that forms

10   the basis for prison disciplinary actions." Cato v. Rushen, 824 F.2d

11   703, 705 (9th Cir. 1987); Zimmerlee v. Keeney, 831 F.2d 183, 186

12   (9th Cir. 1987); Luna v. Pico, 356 F.3d 481, 488 (2nd Cir. 2004)(ho-

13   lding that "'reliable evidence,' and not just 'any evidence,' is

14   required."); Lenea v. Lane, 882 F.2d 1171, 1175-76 (7th Cir. 1989),

15   Aquiar v. Tafoya, 95 Fed. Appx. 931, 935 (10th Cir. 2004); Zepeda v.

16   Uribe, 710 F. Supp. 2d 1024, 1031 (S.D. Cal. 2010). Petitioner

17   argues that despite the unreliable nature of the evidentiary

18   summary, the administrative and state court decisions relied upon

19   it.

20        Looking to Hill, the Court notes that the determinations by

21   the state courts should remain undisturbed as long as some evidence

22   exists to support their findings. However, from the evidentiary

23   record, the Court cannot find reliable evidence to support the

24   findings of the Court of Appeal.

25        The Court looks to the decision of the California Court of

26   Appeal, because it is the last reasoned opinion. The Court of Appeal

27   wrote that "[t]he evidence supported the conclusion that petitioner

28   possessed the weapon because it was found in his cell." (Respon-

10cv2203

dent's Lodgment No. 4, at 2.) The court then explained that the law
"supports imputing possession to petitioner under these facts" due
to the doctrine of constructive possession. Id. It also noted that
it was bound by the "any evidence" standard set forth by Hill. Id.
Since the Court of Appeal found that there was some evidence in the
record, it affirmed the decision of the Superior Court. Id. at 2-3.

Likewise, the Superior Court relied upon the SHO's record of
the evidence produced at the hearing. See In re Larry Rosser, No.
EHC 01253 at 1 (Cal. Sup. Ct. of Imperial County, 2009). The
Superior Court applied the Hill and Zepeda standard, and found that
the SHO's decision was supported by "some" evidence. Id. at 2.

The decisions at the Director's Level and Second Level both
relied upon the SHO's record of the evidence as truthful, accurate,
and reliable. The Director's Level Decision stated that Petitioner's
"allegations that ... staff falsified documents ... were unsup-
ported." The decision apparently relied upon the findings made by
the Second Level Appeal, even going so far as to repeat the Second
Level Appeal's factual error that the book in which the weapon was
secreted came from cell 151U. [Petition, Exhibit 1(a)(3).]

The Second Level Appeal decision addressed the Petitioner's
claim of falsified or inaccurate evidence briefly and indirectly,
stating that "[t]he circumstances of the RVR states [sic] the inmate
manufactured weapon was secreted inside of a book, which was labeled
as coming from cell 151U." Id. at Exhibit 1(a)(1). This is factually
incorrect. Throughout the incident report submitted by both
Petitioner and Respondent, the weapon is reported to have come from
cell 151L, not 151U. The Second Level Appeal dismissed Petitioner's

10cv2203

1    allegation of insufficient evidence as "unfounded as the SHO refers

2    to three references utilized to support his finding." Id.

3         Since all subsequent hearings have relied upon the SHO's

4    record of the evidence, this Court now turns to the three pieces of

5    evidence relied upon by the SHO. (See Respondent's Lodgment No. 3,

6    Exhibit I.) The evidence consists of Officer Hernandez's report,

7    testimony by witnesses, and the Incident Report.

8         Officer Hernandez's report states that he searched through

9    the book to find the weapon. His report also states that the book

10   was labeled as coming from ASU-151L. The report does not claim any

11   knowledge of the chain of custody of the book prior to Officer

12   Hernandez's inspection at the x-ray scanning area. Moreover, the

13   reliability of this report is suspect since it appears to have been

14   signed, dated, and reviewed on June 20, 2008 (four days before the

15   cell searches occurred). Even if the reporting date is a typographi-

16   cal error, the fact that the reviewer not only failed to spot and

17   even repeated the inaccurate date, raises serious questions as to

18   the truthfulness, accuracy, and reliability of this document.

19        The witness testimony at the hearing that the SHO relied upon

20   came from Inmate Throop and Officer Rucker. Inmate Throop's

21   testimony is summarized as "Throop testified that 'there was much

22   confusion, many people working in a small space. Throop's opinion

23   was that the Staff was confused and liable to make mistakes.'"

24   However, it appears that Inmate Throop's testimony was likely much

25   more substantial. In his Declaration (signed at a date after the

26   hearing), Throop discusses seeing three unknown officers inside cell

27   151 at some point before seeing the two officers who signed the cell

28   search receipt for the same cell. Throop also discusses seeing

10cv2203

stacks of magazines, books, and newspapers strewn about the ASU, both in and out of milk crates. Since Throop's later written declaration is significantly more substantial than what the SHO recorded as his oral testimony, the SHO's summary of Throop's testimony is also suspect. However, the SHO's decision does not appear to rely on this evidence.

The SHO's report also summarizes Officer Rucker's testimony as being unable to recall what was inside the milk crate Petitioner and his cell mate discovered upon their return to cell 151. However, this is in direct conflict with what Officer Rucker wrote in a later declaration. On October 9, 2008, Officer Rucker answered questions nearly identical to those posed at the RVR hearing in significantly more detail. Specifically, he clearly recalled that the milk crate contained legal and miscellaneous paperwork and "seem[ed] to recall" books and magazines. In his written responses, Officer Rucker remembered that the items had Hispanic names on them, that they were addressed to A-5, and even recalled that the paperwork was post-marked or dated in May.[6] How Officer Rucker was able to recall these facts in October 2008 but not during the oral hearing in August 2008 is unclear. What is clear is that the summary of witness testimony prepared by the SHO is unreliable in light of the later recollections of both the inmate and officer who gave the testimony.

The third piece of evidence relied upon by the SHO was the lengthy Incident Report. The Court directs its attention to those portions involving Petitioner and his cell mate. On page 28 of the Incident Report, Officer Castro reported that he or she "placed the

---

[6] The record does not explain who or what A-5 was.

1   lower bunk property ... into a crate" but does not specify what
2   property that was. Officer Castro reports that at some later point,
3   Sgt. Smith removed a book from the property, labeled it at that
4   time, and gave it to Officer Hernandez to search. How Officer Castro
5   knew of Sgt. Smith's actions is unclear. According to page 17 of the
6   incident report, Sgt. Smith did not process evidence. Officer
7   Castro's account also indicates that individual items of property
8   were not labeled until they were removed from the milk crate at the
9   x-ray station. The incident report does not include the statements
10  of officers responsible for scanning the crates, removing suspect
11  property from the crates, and correctly labeling that property.
12  Therefore, the chain of custody relies on hearsay.[7/] Officer
13  Hernandez's report as to the physical search of the book, discussed
14  *supra*, is included in this incident report.

15       What can be gleaned from this incident report is that
16  property present in Petitioner's shared cell was collected and
17  placed in a milk crate and that the crate was scanned. A weapon was
18  found in a book but the chain of custody of that book is unclear.
19  The officer who removed the book from the crate and labeled it
20  offered no written account. The officer who placed inmate Muhammed's
21  property in the crate did not report that a book was among that
22  property.

23

24  _____

25  [7/]   Working backwards, the chain of custody is as follows. Officer
        Hernandez found a weapon in a book labeled 151L. Evidence for this
26      event comes from a report dated and reviewed four days before the
        searches. The book was removed and labeled from cell 151L's crate by
27      Sgt. Smith. No evidence or testimony from Sgt. Smith is included in
        the record. Cell 151L's crate was filled with property from that
        cell by Officer Castro. Evidence for this is provided by Officer
28      Castro's report; also included is Officer Castro's hearsay claim
        that "I was later informed that a razor blade was discovered inside
        the book".

10cv2203

1    Therefore, the Court concludes that the evidence cited by the
2    SHO to find Petitioner guilty is largely unreliable. Specifically,
3    the report by Officer Hernandez was dated and reviewed four days
4    before the searches, the summary of witness testimony contradicts
5    later declarations by those same witnesses, and the incident report
6    fails to report the chain of custody of the book containing the
7    weapon. The evidentiary record prepared by the SHO and relied on by
8    subsequent hearings appears to exclude certain evidence that weighs
9    in Petitioner's favor. Specifically, the SHO omitted evidence
10   supporting Petitioner's apparent contention that the book containing
11   the weapon was left in his cell, along with property belonging to
12   other inmates, before Officer Castro took inmate Muhammed's property
13   to be scanned.

14   The only reliable evidence, which could be considered "some
15   evidence" under _Hill_, is as follows: First, the cells in the ASU
16   were searched on June 24, 2008. Second, in the course of this
17   search, some property, which may or may not have been commingled
18   with the belongings of other inmates, was removed from inmate
19   Muhammed's bunk and placed in a crate. Third, this crate was taken
20   to an x-ray machine and scanned. Fourth, Officer Castro heard that
21   the scan had been positive.

22   The SHO relied upon unreliable reports and witness testimony
23   in finding Petitioner guilty of possessing the weapon in question.
24   Subsequent administrative and state court proceedings relied upon
25   the SHO's characterization of the evidence. Consequently, while this
26   Court is bound by the strictures of _Hill_ because the decisions of
27   the SHO and subsequent hearings did not rely on any reliable

28

10cv2203

1   evidence, this Court concludes that Hill's "some evidence" standard
2   was not met.

3        This Court finds that a serious chain of custody question
4   exists in this case. It is unclear if and when property belonging to
5   other inmates entered Petitioner's cell and whether that property
6   was commingled with his cell mate's possessions. Furthermore,
7   testimony may have been mischaracterized, reports may have been
8   misdated and inadequately reviewed, and even the RVR charging the
9   Petitioner references a different cell number.

10       The Court remains faithful to the Supreme Court's admonition
11  in Hill that it should not reweigh the evidence or judge the
12  credibility of witnesses. However, the only evidence used to
13  determine where the weapon was found is unreliable. Furthermore, the
14  veracity of the SHO's summary of evidence presented at the hearing
15  is questionable. The Court finds that the findings of the Court of
16  Appeal, the Superior Court, and the various administrative hearings
17  all relied upon this faulty summary of evidence. The record
18  presented to the Court rebuts the presumption of correctness given
19  to the Court of Appeal's factual findings. See U.S.C. § 2254(e)(1);
20  see also Dretke, 545 U.S. at 240.

21       For the reasons set forth above, the Court of Appeal's
22  decision involved an unreasonable application of U.S. Supreme Court
23  law and was based on an unreasonable determination of the facts in
24  light of the evidence presented.

25       Therefore, the Court RECOMMENDS that Petitioner's fourth
26  ground for relief be GRANTED.

27       Consequently, this Court RECOMMENDS that the Petition be
28  GRANTED.

10cv2203

1                     VII

2           CONCLUSION AND RECOMMENDATION

3       After a review of the record in this matter, the undersigned

4 Magistrate Judge recommends that the Petition be GRANTED.

5       This Report and Recommendation of the undersigned Magistrate

6 Judge is submitted to the United States District Judge assigned to

7 this case, pursuant to 28 U.S.C. § 636(b)(1).

8       **IT IS ORDERED** that no later than August 12, 2011, any party

9 to this action may file written objections with the Court and serve

10 a copy on all parties. The document should be captioned "Objections

11 to Report and Recommendation."

12       **IT IS FURTHER ORDERED** that any reply to the objections shall

13 be filed with the court and served on all parties no later than

14 September 2, 2011. The parties are advised that failure to file

15

16

17

18

19

20

21

22

23

24

25

26 objections within the specified time may waive the right to raise

27 those objections on appeal of the Court's order. Martinez v. Ylst,

28 951 F.2d 1153 (9th Cir. 1991).

10cv2203

1

2

3

4    DATED:   July 13, 2011

5

6    _____
     Hon. William V. Gallo
7    U.S. Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10cv2203